SCHUETTE, Respondent, vs. TAX COMMISSION and others, Appellants. [Two cases.]

*April 10—May 7, 1940.*

For the appellants there was a brief by the *Attorney General* and *Harold H. Persons,* assistant attorney general, and oral argument by *Mr. Persons.*

For the respondents there was a brief by *Nash & Nash* and *Edward L. Kelley,* and oral argument by *Mr. A. F. Rankin* and *Mr. Kelley,* all of Manitowoc.

NELSON, J. The relevant facts in these appeals are either the same or so similar in all respects as to give rise to identical questions of law. Prior to the year 1929, Edwin Schuette acquired three thousand three hundred sixty shares of stock in the Aluminum Goods Manufacturing Company. Louis Schuette also owned stock in that company. Both of them also owned stock in the Manitowoc Savings Bank. In 1929, Edwin Schuette transferred his three thousand three hundred sixty shares of stock in the company to his brother, Louis Schuette, who, at the same time, and as part of the same transaction, transferred five hundred shares of his bank stock to Edwin. At the time the stocks were exchanged, each block of stock was valued at $100,000. Both separately reported the transaction in their income tax returns for the year 1929, but both asserted that no taxable income resulted from such exchange of stocks. Some time thereafter the Tax Commission made field investigations of their returns for the years 1929 to 1934, inclusive. As a result of those investigations and audits, each of the Schuettes, on November 21, 1935, was given a notice of a proposed additional assessment of income taxes. An additional assessment against each of them for the year 1929 was based upon an asserted profit that each of them had made as a result of the exchange of stocks. The asserted profit was computed by taking the difference between the market or agreed value of the shares of stock received by each of them and the total cost to each of them of the stock transferred. On December 9, 1935, each respondent duly filed his objections to the additional assess-

ment proposed and each requested a hearing thereon. The additional assessments were computed on the average cost of stock in compliance with the rule stated in *Long v. Tax Comm.* 208 Wis. 668, 242 N. W. 562. Before hearings were had on the additional assessments, ch. 505, Laws of 1935, was enacted. That statute changed the rule stated in *Long v. Tax Comm., supra.* This change in the law necessitated a recomputation of the profit asserted to have arisen from the exchange of the stocks. On October 31, 1936, each respondent was given a notice that the proposed additional assessment of income taxes, contained in the notices of November 21, 1935, was amended in accordance with the provisions of said ch. 505. On November 16, 1936, each respondent filed objections to the proposed additional assessment as amended and requested a hearing thereon. On July 20, 1937, hearings were duly had before the board of review. On January 13, 1938, the board canceled each of the amended assessments, basing its decisions on the ground that the incomes of the Schuettes for the year 1929 were not open in the year 1935 to additional assessments or corrections by office audits or field investigations. The assessor of incomes thereupon appealed to the Tax Commission pursuant to sec. 71.15, Stats. 1937, for a review of the determinations of the board of review. Before those appeals were heard, and on March 4, 1938, each of the Schuettes was given a new notice of an additional assessment of income for the year 1929. Said notices were given in pursuance of sec. 71.115 (1) (a), Stats. 1939, enacted by ch. 1, by the 1937 special session of the legislature. Each notice contained the same proposed additional assessment hereinbefore mentioned. No objection or request for a hearing on said new notices was made by either of the Schuettes. On January 19, 1939, the Tax Commission reversed the decision of the board of review and affirmed the additional assessments of the income taxes made by the assessor of incomes. The commission decided

that each of the Schuettes made a profit taxable as income on the exchange of his stock. Thereafter, each of the respondents appealed to the circuit court pursuant to sec. 71.16, Stats. 1937. On August 4, 1939, the circuit court held, (1) that the notices of March 4, 1938, were not parts of the records of the board of review, were not before the court, and were therefore of no effect; and (2) that in the year 1935, at the time the notice of November 21, 1935, was given the incomes of the respondents for the year 1929 were no longer open to additional assessments or corrections. Judgment was accordingly entered.

The appellants contend that the court erred, (1) in holding that the 1929 returns of the respondents were not open to audit and correction in 1935, and (2) in holding that the notices of March 4, 1938, could not be considered by the court because they were not parts of the records of the board of review.

Two principal questions require determination: (1) Did each of the respondents realize a taxable income as a result of exchanging his stock in one corporation for stock in another, which exchange was based upon an agreed valuation of each block of stock of $100,000? (2) Were the additional assessments of income taxes for the year 1929 made within the time permitted by law?

We shall first determine the second question. This question involves two subordinate questions: (a) The validity and constitutionality of sec. 71.115 (1) (a), Stats., *supra,* and (b) whether the court should have given consideration to the notices of March 4, 1938.

Sec. 71.11 (5), Stats. 1929, in part, provided:

"Additional assessments and corrections of assessments may be made of income of any taxpayer if such corrections are made within seven years after the close of the period covered by the income tax return, provided that after *July 1, 1929,* additional assessments or corrections and assessments may be made if such assessments and corrections

are made *within four years* after the close of the period covered by the income tax return."

Sec. 71.12, Stats. 1929, in part, provided:

"Any person feeling aggrieved by such assessment shall be entitled to a hearing before the tax commission in the case of corporations or the county board of review in the case of persons other than corporations, if within twenty days after receiving notice of such proposed assessment he shall apply for such hearing in writing, explaining in detail his objections to such assessment."

Sec. 71.11 (5), *supra,* was amended in 1931 by striking out "July 1, 1929" and inserting in lieu thereof "July 1, 1933." Ch. 53, Laws of 1931. In 1933, the income tax law was amended to read, in part, as follows:

"71.115 *Years open to audit and adjustment.* (1) Additional assessments and corrections of assessments by office audit or field investigation may be made of income of any taxpayer if notice of such assessments or corrections is given pursuant to section 71.12 *within six years* after the close of the period covered by the income tax return. . . .

"(4) All additional assessments of back income taxes shall be deemed to have been made within the limitation period provided by section 71.11 (5) of the Statutes for 1927, 1929 and 1931, if notice thereof pursuant to section 71.12 was given to the taxpayer while the years the income of which is included in such assessments were open to adjustment and correction under section 71.11 (5) of said statutes."

Sec. 71.115 (1) (a), Stats., enacted by the legislature at its special session in 1937, provided, in part, as follows:

"(1) Additional assessments and corrections of assessments by office audit or field investigation may be made of income of any taxpayer if notice pursuant to section 71.12 is given within the time specified in this subsection.

"(a) *Subsequent* to the enactment of this subsection and *prior to April 1, 1938,* such notice may be given with respect to income received in any year or years subsequent to the *calendar year 1926* or corresponding fiscal year. A notice

pursuant to section 71.12 given prior to the enactment of this subsection shall not preclude the tax commission or the assessor of incomes from giving a notice within the time herein specified unless heretofore the assessment or correction based upon such prior notice has become final and conclusive under the provisions of sections 71.12, 71.13, 71.14, 71.15 and 71.16. In instances where an additional assessment or correction of an assessment based upon such prior notice has not become *final and conclusive,* the record and proceedings in respect thereto shall be applicable to any notice given within the time herein specified unless, within twenty days after such later notice, an application for hearing is filed in accordance with section 71.12 in which case the former record and proceedings shall be vacated and new proceedings taken in accordance with sections 71.12, 71.13, 71.14, 71.15 and 71.16."

It was pursuant to that statute that the notices of March 4, 1938, hereinbefore mentioned, were given.

The respondents contend, and the circuit court held, that sec. 71.11 (5), Stats. 1929, was a true statute of limitation which had run prior to the year 1935, as a result of which rights had vested in the respondents which prevented the legislature from thereafter enacting a law opening or enlarging the period within which additional assessments or corrections might be made. Similar contentions were made in a similar controversy. *State ex rel. Globe Steel Tubes Co. v. Lyons,* 183 Wis. 107, 197 N. W. 578. At the time the claimed income there considered was asserted to have accrued the law permitted the Tax Commission to investigate and determine the true amount of taxable income received by a corporation at any time within three years after the year in question. The applicable statute (sec. 71.10 (1), Stats. 1921), provided, in part:

"*Incorrect returns by corporations; penalty for frauds and refusal to make returns.* (1) Whenever it shall appear probable that a corporation has been over or underassessed, or that no assessment has been made when one should have been made in any one or more of *the next previous three*

*years,* the tax commission may require such corporation to furnish such information with reference to its capital, surplus and business transacted as it may deem necessary to enable it to ascertain the amount of taxable income such corporation received during the year or years in question. Upon such information and such other information as it may be able to discover the commission shall determine the true amount of taxable income received during the year or years under investigation. If all or any part of the amount so ascertained shall not previously have been assessed, the same shall be assessed and entered upon the assessment rolls in the year discovered, and the normal tax thereon may be computed at twice the original rate."

That section was amended by ch. 1, Laws of Sp. Sess. 1922, and the language: "the next previous three years" was changed to "the next previous six years." In 1923, by ch. 389, Laws of 1923, the language: "the next previous six years" was changed to "any of the years following January 1, 1915." It was there contended that the three-year limitation contained in the original act was a statute of limitation which, after it had run, could not be enlarged or changed. It was there said (p. 121):

"It is claimed that the three-year limitation on the tax commission in the original act was a statute of limitation in favor of the income owner. That claim is untenable. The limitation was on the commission's authority to go back and reassess beyond the three previous years. But the statute did not wipe out the obligation of the income owner to pay his tax. 'The payment of taxes is an obvious and insistent duty.' *Bankers Trust Co. v. Blodgett,* 260 U. S. 647, 43 Sup. Ct. 233. Statutes of limitation do not run against the state unless expressly so provided. *Florida Cent. & P. R. Co. v. Reynolds,* 183 U. S. 471, 22 Sup. Ct. 176."

The respondents appreciate the effect of that holding but claim that the law of that case was overruled by this court in *Weyenberg Shoe Mfg. Co. v. Kellcy,* 210 Wis. 638, 643, 246 N. W. 418, 247 N. W. 320. It is true that in that case the statute there considered was called "a statute of limita-

tion." In that case the limitation period had expired before notice of additional assessments was given, and it was therefore held that the authorities were without power, in the absence of legislative enactment reopening the period, to make additional assessments for the years in question. It was there said:

"Our conclusion is that the legislature intended that the taxpayer should, after a definite period, know what his tax liability is. Upon termination of the four-year period he can close his books and deem himself free from further tax liability for the years that have passed beyond this time limit *in the absence of legislative enactment reopening that period.*"

The italicized language significantly connects the holding there with the rule stated in *State ex rel. Globe Steel Tubes Co. Case, supra,* although that case was not mentioned in the opinion. The holdings in those cases are therefore not inconsistent. Under the rule of the *State ex rel. Globe Steel Tubes Co. Case,* the statute is not a limitation in favor of the taxpayer and against the state, but rather a limitation upon the commission's authority to go back and to make new assessments for years not permitted at a given time by the legislature. Under that ruling it may not be said that the taxpayer has acquired any vested rights against the state as to assessments which properly should have been made. Under the construction which we have given to similar statutes, taxpayers acquire no vested rights against the state, as to such assessments. We consider therefore that sec. 71.115 (1) (a), Stats., is a valid and constitutional enactment.

The trial court held that the notice of March 4, 1938, could not properly be considered a part of the record before the court. Sec. 71.16 (8), Stats. 1937, provided, in part:

"Said appeal [to the circuit court] may thereupon be brought on for hearing by either party *upon the record made before* the tax commission or *the county board of review and not otherwise.*"

It appears that the notice of March 4, 1938, was not actually made a part of the record of the board of review. It was, however, brought to the attention of the Tax Commission on appeal and also to the attention of the circuit court. The circuit court was correct in concluding that the notice of March 4, 1938, was not a part of the record made before the board of review, but it does not follow that the Tax Commission could not have considered it or that the circuit court should not have considered it.

Sec. 71.115 (1) (a), Stats., provided that notice of additional assessments and corrections of assessments might be given subsequent to its enactment and prior to April 1, 1938; that such notice might be given with respect to income received in any year or years subsequent to 1926; that a new notice might be given within the time specified regardless of the fact that a prior notice had theretofore been given; that such new notice would be effective unless the assessment or correction of income had become final and conclusive; that if such prior assessment and correction had not become final and conclusive the record and proceedings in respect thereto should be applicable to the new notice unless within twenty days an application for a hearing was made and filed, in which case the former record and proceedings should be vacated and new proceedings taken in accordance with the applicable statutes enumerated.

The legislature doubtless was informed that numerous income tax controversies were pending before boards of review, the Tax Commission, or the circuit courts, all of which had not become final and conclusive either because not determined, or because appeals were still permissible, and that in many of those controversies contentions were being made that the taxing authorities were without power to act because no timely notice of additional assessments or corrections had been given in pursuance of prior applicable laws. It was clearly the legislative intent to enlarge the periods limited by former laws and to make it possible for the

authorities to make additional assessments and corrections which they could not do under the limitations of prior laws.

While the statute did not specifically provide just how the new notice should be introduced or called to the attention of the Tax Commission, the circuit court, or this court, in proceedings still pending on appeal before the Tax Commission, the circuit court, or this court, the legislature intended and purposed that when such new notice was given it should in some proper manner be filed in the proceedings, no matter where then pending. If this were not true, the law would be wholly ineffective as to all controversies except those then pending before boards of review. Such a construction of the statute would obviously prevent its application to many controversies then existing and in large part destroy its effectiveness.

It appears that the board of review rendered its decisions on January 13, 1938, shortly after sec. 71.115 (1) (a), Stats., was enacted. The new notices were not given until March 4, 1938, although within the period of time specified by the act. The assessor mailed the notices to the respondents by registered mail and made proof of such mailing by his affidavits to which he attached the registry receipts issued by the post office. He then filed them with the board of review. They were returned to the Tax Commission by the clerk of the board and certified as a part of the record made by him. While the new notices never actually became a part of the record of the board of review upon which the decision of the board was rendered, we consider that the circuit court should not have ignored them because not technically a part of the record. The respondents moved the court to strike the notices because not a part of the record. The respondents apparently raised no question as to the giving of the notices or as to their not having filed objections or requested hearings in pursuance of such notices. Had there been any such question, they doubtless would have offered proof of such facts and moved the court to remand the controversy

to the assessor of incomes in pursuance of the intent of the act.

The circuit court also entertained some doubt as to the sufficiency of the proof contained in the affidavit of the assessor that "no objection or request for hearing in respect to these new notices of additional assessment was filed by the taxpayers." Adverting to that statement, the court said:

"That may or may not be a fact. How does this court know it to be a fact unless it accepts the statement as a verity. On page 16 of plaintiff's reply brief is to be found the following with reference to that notice 'In the instant case, the document sought to be included in the record is certified only by the party who seeks its inclusion, *i. e.,* the assessor, and the taxpayer has had no opportunity to be heard in regard to it.' "

In view of the facts that the respondents were represented by attorneys who were learned in the fields of taxation, and who raised no questions respecting objections or requests for hearings, and made no motions to dismiss the proceedings or to remand the record to the assessor, we consider the circuit court's views to be supertechnical. We conclude, therefore, that the circuit court erred in ignoring the new notices given pursuant to sec. 71.115 (1) (a), Stats.

Since the circuit court was of the view that sec. 71.11 (5), Stats. 1929, was a true statute of limitation, the running of which resulted in vested rights which thereafter could not be taken away by the legislature, and that the new notices given on March 4, 1938, were not a part of the record and therefore should be ignored, it did not determine whether the stock transaction gave rise to profits which resulted in taxable income.

Sec. 71.02, Stats. 1929, provided, in part, as follows:

"(2) The term 'gross income,' as used in this act, shall include: . . .

"(d) All profits derived from the transaction of business or from the sale of real estate or other capital assets; . . .

"(h) And all other gains, profits or income of any kind derived from any source whatever except such as hereinafter exempted."

In the leading case of *Eisner v. Macomber,* 252 U. S. 189, 207, 40 Sup. Ct. 189, 64 L. Ed. 521, income was defined as " '. . . the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets."

In *MacLaughlin v. Alliance Ins. Co.* 286 U. S. 244, 249, 52 Sup. Ct. 538, 76 L. Ed. 1083, it was said:

"Increase in value of property . . . is nevertheless a gain from capital investment which, when realized, by conversion into money or other property, constitutes profit which has consistently been regarded as income within the meaning of the Sixteenth amendment and taxable as such in the period when realized." (Citing cases.)

It is contended by the respondents that the exchange of stock by the respondents did not result in profits "derived from the transaction of business," but it is not contended that the exchange of the stocks did not amount to a *bona fide* sale of the stocks in question each to the other. The Schuettes were brothers and each was agreeable to furthering the desires of the other as to his stock holdings in the company and in the bank. But that fact, in our opinion, is without materiality since it appears that each *bona fidedly* sold and transferred his stock to the other on a basis of an agreed valuation of $100,000. Had either of the respondents sold his stock for the sum of $100,000 or had he exchanged it for stocks or bonds of listed market value, no question doubtless would have been raised and no contention would have been made that such a transaction would not result in a profit which properly should be considered income. Where stocks of separate distinct corporations are exchanged on a basis of agreed value which is more than the cost thereof, we entertain no doubt that taxable income results.

The respondents rely upon *Miller v. Tax Comm.* 195 Wis. 219, 217 N. W. 568, and *C. F. Burgess Laboratories v. Conway,* 195 Wis. 324, 218 N. W. 172. In the *Miller Case* it appeared that Miller had constructed a cold-storage warehouse upon a railroad right of way at a cost of $155,764.77; that he had organized a corporation under the name of S. Miller Cold Storage Company with an authorized capital stock of $200,000; that he had transferred the warehouse to the company in exchange for all of its capital stock and a note of the company for $10,000. It was sought to treat as income the difference between the cost of the warehouse and the $210,000,—the par value of the stock plus the $10,000 note. It was held that no profit to Mr. Miller resulted because the value of the stock and note received by him were of the exact value of the warehouse conveyed to the company; that his interest in the property after the transaction was simply evidenced by a different muniment of title and that the fact that sec. 182.06, Stats., prohibited a corporation from issuing any stock except in consideration of money or of labor or property estimated at its true money value, was not controlling where a transaction, involving stock, does not in fact result in gain, profit, or income. In the opinion in that case, the following language appears (p. 221):

"It has never been held that the mere exchange of properties constituting capital assets gives rise to a gain upon which an income tax may be imposed. In order to give rise to an income there must be a sale of capital assets at a profit. Generally but not necessarily the sale must be for money. The transaction should be one that constitutes a sale rather than a mere exchange of properties. If the property transferred is compensated by bonds or other securities possessing a fixed market value and which can readily be converted into cash, the transaction probably constitutes a sale. But where a farm, for instance, is exchanged for another farm, the transaction is commonly regarded not as a sale but as a mere exchange of properties."

The language, "It has never been held that the mere exchange of properties constituting capital assets gives rise to a gain upon which an income tax may be imposed," is much too broad and even if true then, cannot now be justified, as will later appear.

In the *C. F. Burgess Laboratories Case, supra,* this court, in a brief opinion, followed the rule of the *Miller Case, supra,* and held that the transaction there considered involved merely a substitution of one form of evidence of ownership for another form of evidence of ownership and did not result in any gain or profit to the Burgess Laboratories.

In *Bryant v. Commissioner of Corporations and Taxation,* 291 Mass. 498, 500, 197 N. E. 509, it was held that an exchange of stock in one corporation for stock in another corporation, having a market value greater than the cost of the stock surrendered, resulted in a taxable gain. The court said:

"The shares received by the taxpayer do not represent the same interest and the same assets as those given in exchange. They apparently have no relation to each other except that one was received in exchange for the other. . . .

"The transaction by way of exchange constituted a sale by the taxpayer of her stock and the purchase of other stock in its stead."

In *Lackey v. State Tax Dept.* 35 Del. 507, 168 Atl. 194, it was held that an exchange of stock of two separate corporations resulted in a loss which the taxpayer might claim. In several cases decided by the United States supreme court, involving somewhat analogous situations, where stock in an old corporation was exchanged for stock in a new corporation, it was held that a gain or profit based on the difference between the market value of the new stock and the cost of the old stock, was taxable. *United States v. Phellis,* 257 U. S. 156, 42 Sup. Ct. 63, 66 L. Ed. 180; *Cullinan v. Walker,* 262 U. S. 134, 43 Sup. Ct. 495, 67 L. Ed. 906; *Marr v.*

*United States,* 268 U. S. 536, 45 Sup. Ct. 575, 69 L. Ed. 1079. In the latter case it was said (p. 541):

"In the case at bar, the new corporation is essentially different from the old. A corporation organized under the laws of Delaware does not have the same rights and powers as one organized under the laws of New Jersey. Because of these inherent differences in rights and powers, both the preferred and the common stock of the old corporation is an essentially different thing from stock of the same general kind in the new."

In *Bancker v. Commissioner of Internal Revenue* (5th Cir.), 76 Fed. (2d) 1, 2, cert. den. 296 U. S. 603, 56 Sup. Ct. 119, 80 L. Ed. 428, which involved an exchange of stock in the Coca-Cola Company for stock in the Coca-Cola International Corporation, it was said:

"A money-measured sale or an exchange for property having a readily ascertainable market value is the usual means of realization recognized by the statutes. . . . Notwithstanding the close relationship maintained in 1930 between the shares involved in Bancker's exchange, they were essentially different. The corporations, though organized under the same law, probably had different corporate powers and certainly were engaged in wholly different activities."

It was held that the exchange was a true conversion of the taxpayer's capital into a substantially different investment and served to realize and measure the gain he had had from his original purchase of Coca-Cola stock. See also, to the same effect, *Rose v. Trust Company of Georgia* (5th Cir.), 77 Fed. (2d) 355; *Prescott v. Commissioner of Internal Revenue* (5th Cir.), 76 Fed. (2d) 3.

We therefore conclude that when Edwin Schuette exchanged his Aluminum Company stock for stock in the Manitowoc Savings Bank upon an agreed value basis of $100,000, which was more than the cost of the Aluminum Company stock, a profit or gain resulted which was taxable to him. The same conclusion follows as to the transfer by Louis Schuette of five hundred shares of bank stock to Edwin

Schuette. It may be said in conclusion that neither of the respondents sought to cover up the transaction. They, apparently, in good faith believed that the transaction in question did not give rise to any taxable income.

*By the Court.*—The mandate in each case is: Judgment reversed, and cause remanded with directions to affirm the order of the Tax Commission.